UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

HARPOLE CONSTRUCTION, INC.,            Case No. 15-12630 t11

    Debtor.

HARPOLE CONSTRUCTION, INC.,

    Plaintiff,

v.            Adv. No. 16-1058 t

MEDALLION MIDSTREAM, LLC,

    Defendant.

## OPINION

Before the Court is debtor's claim that an oil and gas pipeline company breached a post-petition contract by throwing debtor off a construction job and refusing to pay for work performed. The pipeline company counterclaimed for damages allegedly caused by debtor's breach of the contract. After trial on the merits, the Court rules that debtor is entitled to be paid for the work it did, but that the amount due is more than offset by the cost of fixing debtor's substandard work and paying off liens filed on the job. The Court will enter a net judgment against the debtor, and in favor of the pipeline company, for $28,850.71. No attorney fees or prejudgment interest will be awarded because neither party prevailed.

I. Findings of Fact

The Court finds the following facts:[1]

Plaintiff Harpole Construction, Inc. filed this chapter 11 case on October 2, 2015. Harpole is a New Mexico corporation that installs and services oil pipelines in New Mexico and Texas. It conducts business from construction yards in Farmington, New Mexico; Hobbs, New Mexico; and Midland, Texas. Hobbs and Midland are in the Permian Basin, an area well known for its large oil and natural gas deposits.

Defendant Medallion Midstream, LLC is a Delaware limited liability company. Medallion owns and operates oil pipelines in Texas.

In early April 2016, a representative of Medallion invited Harpole to bid on four construction jobs, denoted "Buckner Baptist," "Halfmann," "Char Hughes," and "Pettit."

Shortly thereafter, Medallion delivered to Harpole a bid package that included a copy of Medallion's form Master Service Contract (the "MSC").

On April 12, 2016, Harpole submitted to Medallion bids on the four projects. Harpole did not disclose that it was a debtor in possession. A Medallion representative called Harpole on April 19, 2016 and informed it that it was the successful bidder on all four jobs.

On April 26, 2016, Medallion signed and mailed to Harpole four "Work Orders," one for each job. Harpole started work on the four projects in late April 2016.

---

[1] To the extent any finding of fact is construed as a conclusion of law, it is adopted as such, and vice versa. The Court took judicial notice of the docket. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (holding that a court may *sua sponte* take judicial notice of its docket); *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1, 8 (1st Cir. 1999) (same).

In May, 2016, Medallion again contacted Harpole and asked it to bid on a fifth job, known as the "Permian Resources" job. Harpole submitted a bid for the Permian Resources job in late May, 2016. Medallion accepted Harpole's bid, and signed a work order for the job.

Harpole maintained an open account with Medallion and sent weekly invoices. Between April and July, Medallion timely paid each invoice.

Harpole did most of the work on the Halfmann, Char Hughes, and Pettit jobs, apparently without incident. Some clean-up work remained when Harpole switched its efforts to the Permian Resources job.

There was a delay in the Buckner Baptist job, so Medallion decided to have that work done after Harpole completed the Permian Resources job.

Harpole started work on the Permian Resources job in June, 2016. The job site was in Reagan County, Texas, east of the town of Big Lake. The job required, among other things, welding and laying 18 miles of pipeline, which would transport crude oil.

Although Harpole had the sole responsibility under the MSC to perform its work properly, Medallion had inspectors at each job to inspect every weld Harpole made. Johnny Sampson was Medallion's lead inspector on the Permian Resources project. Medallion also hired a third party to x-ray each weld. Finally, before a completed pipeline was put into service, Harpole had to perform a hydrostatic test to ensure there were no leaks.

In June 2016, Harpole employed a subcontractor, Tech Con Trenching, Inc., to dig some of the pipeline trench. Harpole told Mr. Sampson about this and got oral permission to use Tech Con. No written consent was asked for or obtained, however, as required by MSC ¶ 15.

In July, 2016, Jerry Harpole began using a Vermeer T1115 trencher (the "Trencher") to dig the trench for the Permian Resources job. The Trencher had been parked near a portion of the

-3-

Permian Resources right-of-way, on the other side of a fence. The Trencher did not belong to Harpole; it was owned by Hoot Johnson Construction, Inc. Hoot Johnson had not given Harpole permission to use it. On July 27, 2017, Mr. Bryan Johnson, Hoot Johnson's President, came to the job site looking for the Trencher. He found Jerry Harpole using it and demanded an explanation. The discussion became heated. Mr. Johnson eventually called the Reagan County, Texas' sheriff's department. Two deputy sheriffs came out to the job site and interviewed Jerry Harpole and others.

Jerry Harpole testified about his use of the Trencher. He said that he recently ran into a business acquaintance of his, Jesus de Villalobos. They spoke, and during their conversation Mr. Villalobos told Mr. Harpole that he had just purchased a trencher at an equipment auction in Midland. Mr. Harpole asked Villalobos if he could use the trencher to finish the Permian Resources job, and Villalobos agreed to loan him the trencher so long as he hauled it to Farmington, New Mexico when he was done. Mr. Harpole testified that Villalobos told him the trencher was located somewhere east of Big Lake. Mr. Harpole testified that he believed the Trencher was the one Villalobos just bought, so he started using it.

The Court finds Mr. Harpole's testimony about his use of the Trencher hard to credit. The Trencher is a huge, very expensive piece of machinery, weighing about 170,000 pounds. Hoot Johnson paid more than $1.1MM for it in May, 2014. It seems unlikely that Mr. Harpole could appropriate and use such a substantial piece of equipment by mistake. The Court is not ruling that Mr. Harpole knew he was doing something wrong, only that his explanation taxes credulity.[2]

---

[2] In fairness, it is almost as hard to believe that Mr. Harpole openly used Hoot-Johnson's Trencher for two weeks, knowing he had no right to do so. Mr. Harpole seems honest, and the Court cannot see him doing something like that. The Court does not know Mr. Harpole's level of *mens rea*, if any.

-4-

After the deputies completed their interviews, a Medallion employee, Carl Breidenich, ordered Harpole to stop work for the day.

On July 28, 2016, Mr. Breidenich talked to the Reagan County sheriff's office and was told that the sheriff was "going to pursue criminal charges" against Jerry Harpole for his unauthorized use of the Trencher.

Based on that and other information obtained, including a discussion with Jerry Harpole, Mr. Breidenich determined to terminate the MSC. He did so orally, via a telephone call with Jerry Harpole on the afternoon of July 28, 2016. Harpole was ordered to leave the Permian Resources job site.

Medallion asked Harpole to leave about 4,200 wood skids behind.[3] Harpole agreed. On October 20, 2016, Medallion notified Harpole that the skids could be picked up. It cost Harpole $7,320 to haul the skids back to one of Harpole's yards. The fair rental value for the 4,200 skids was $9,000.

The Trencher was substantially damaged by Mr. Harpole's use, and Hoot Johnson filed a lien on the Permian Resources job for those damages. Hoot Johnson agreed with Harpole to release its lien claim upon the payment of $150,000.

Tech Con filed a lien on the Permian Resources job for $122,843.30.

After throwing Harpole off the job, Medallion contracted with Oryx Oilfield Services, the next lowest bidder on the Permian Resources job, to complete the job. Oryx conducted a hydrostatic test on the pipeline Harpole had constructed and detected a leak somewhere. Since finding and fixing the leak was not in the scope of Oryx's contract, the parties signed a "time and

---

[3] Section of the pipeline were assembled and welded while on the skids, before being lowered into the trench and buried.

-5-

Case 16-01058-t    Doc 95    Filed 01/30/17    Entered 01/30/17 16:27:40 Page 5 of 15

materials" contract to locate and fix the leak. The contract had a "cap" of $95,000. After Oryx found and fixed the leak, it discovered another leak, and was hired to find and fix it too.[4] In addition, Medallion hired Oryx to repair or redo "dozens" of other welds. Oryx completed the Permian Resources job, including the repair work, and also completed the Char Hughes, Pettit, and Halfmann jobs.

Under the MSC's choice of law provision, Texas law governs.

II.     Discussion.

A.     Was the Trencher Misappropriation Grounds to Terminate the MSC for Cause?

Medallion did not officially terminate the MSC until August 29, 2016. On that date, Medallion sent a letter to Harpole, notifying Harpole that the MSC has been terminated for "unlawfully misappropriating equipment."

Paragraph 21(c) of the MSC gives Medallion the right to terminate for cause in certain circumstances:

> Company shall have the right to immediately terminate this Agreement and/or any existing Work Orders(s) without further obligation (except payment for Work properly performed) if Contractor: (i) breaches any warranty; (ii) become insolvent, or if insolvency, receivership, or bankruptcy proceedings are commenced by or against Contractor; (iii) fails to comply with Section 18 of this Agreement; or (iv) breaches any other material provision hereunder.

Medallion purported to terminate the MSC because Harpole breached a material provision of the MSC, namely paragraph 4(b):

> Contractor shall comply with all Applicable Laws.[5] In the event a representative of Company or any governmental entity finds any violation of an Applicable Law during the performance of this Agreement, which is caused by Contractor and/or

---

[4] According to the testimony at trial, discovering two leaks by hydrostatic testing is very unusual, and indicates a potentially major problem with work quality.

[5] "Applicable Law(s)" is defined in the MSC as "applicable statutes, regulations, rules, codes, whether governmental or industry, interim administrative orders and/or enforcement actions."

-6-

Contractor's Personnel,[6] corrective action shall be taken immediately by Contractor at Contractor's sole expense without limitation of any rights of Company. If Company, in good faith, or any governmental entity is not satisfied with Contractor's and/or its subcontractor's corrective actions, Company shall have the right to take over such corrective actions at Contractor's sole expense without waiver of any other remedy or any acceptance of liability for the non-compliance.

The Court finds that Harpole's alleged misappropriation of the Trencher did not give Medallion the right to terminate the MSC for cause.[7] A fair reading of paragraph 4(b) is that it probably was not intended to apply to such situations. Some "Applicable Laws" work well with paragraph 4(b). For example, a contractor's obligation to comply with environmental laws clearly is enforceable under the paragraph, as is Medallion's right to take over corrective action if it appears that an environmental problem occurred. Other laws that likely were intended to come within paragraph 4(b) include business and professional licensure laws, health and safety laws, construction permitting ordinances, labor and wage laws, laws relating to the construction of oil and gas pipelines, and the like. In contrast, criminal laws allegedly broken by a contractor employee do not fit well within paragraph 4(b). Who decides if a criminal law is violated? What

---

[6] "Contractor's Personnel" means all employees, supervisors, representatives, agents and other persons to be provided by Contractor and/or its subcontractors for the performance of the Work under this Agreement.

[7] Texas generally follows the Second Restatement of Contracts. "The Restatement lists five circumstances significant in determining whether a failure to perform is material:
(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of the circumstances including any reasonable assurances;
(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing." Restatement (Second) of Contracts § 241 (1981), *cited in Mustang Pipeline Co. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 199 (Tex. 2004).

standard of proof is used? What if Medallion decided that a contractor employee committed a crime, but he or she is never charged, or is charged but is exonerated? What is appropriate "corrective action" for violation of a criminal law? Is it enough to stop violating the law? Or is no corrective action possible?

Further, the Court finds that a fair reading of paragraph 4(b) requires Medallion to give Harpole notice of an alleged violation and an opportunity to rebut the allegation or take prompt corrective action. This finding is based in part on the difficulty of determining whether a violation of law has occurred. Medallion should not have the sole right to determine that issue, nor to determine whether corrective action is possible, nor to determine whether an alleged violation is serious enough to terminate the MSC for breach. There are so many laws, rules, regulations, ordinances, and codes that it is almost impossible to operate a construction business without some employee violating some law every day, even if it is just speeding or driving without a seatbelt. It would be unreasonable to interpret paragraph 4(b) to give Medallion the right to terminate the MSC for breach, without notice or a right to cure, if Medallion determined that any Harpole employee violated any law.[8]

      B.      <u>Did Medallion Have Other Grounds to Terminate For Cause</u>?

Medallion argued that, even if it did not have the right to terminate the MSC because of the Trencher misappropriation, it properly terminated the MSC for cause for a number of other reasons.

---

[8] For example, Mr. Harpole allegedly committed criminal mischief by damaging the Trencher during use. Under Texas law, criminal mischief can be a minor offense if the property damage is nominal. Probably not every criminal mischief claim would rise to the level of a material breach of contract.

-8-

1. <u>Failure to Disclose Bankruptcy</u>. Harpole's failure to disclose that it was a chapter 11 debtor in possession did not give Medallion cause to terminate the MSC. Harpole did not become insolvent after the MSC was executed, nor was any bankruptcy proceeding commenced against Harpole after it signed the MSC. If Medallion wanted to ensure that an undisclosed bankruptcy was grounds to terminate the MSC, it should have required Harpole to represent and warrant that it was not a debtor in possession. Further, Medallion did not know that Harpole was a debtor when Medallion terminated the contract.

2. <u>Written Consent to Employee Subcontractor</u>. Harpole's failure to obtain written permission to use Tech Con was not cause to terminate the MSC. While paragraph 15 of the MSC requires written consent, Harpole gave oral notice to Mr. Sampson, and obtained Mr. Sampson's oral consent to use Tech Con. The time for Medallion to insist on written consent was before it gave its oral consent. *See, e.g.*, *Hanks v. GAB Business Services, Inc.*, 644 S.W.2d 707, 708-709 (Tex. 1982) (right to rescind contract waived when party treats contract as continuing) *and Henry v. Masson*, 333 S.W.3d 825, 840 (Tex. App. 2010) ("However, if, after the breach, the non-breaching party continues to insist on performance by the party in default, the previous breach constitutes no excuse for nonperformance on the part of the party not in default and the contract continues in force for the benefit of both parties.") (internal quotation omitted).

3. <u>Subcontractor Liens</u>. Harpole's failure to pay Tech Con and Hoot-Johnson did not constitute cause to terminate the MSC for breach. First, Medallion's remedy for a lien filed on a job is to withhold contract payment funds sufficient to pay off the liens. MSC ¶ 8. Second, no liens had been filed when Medallion terminated the MSC, so there could have been no material breach on the termination date. Third, Harpole's failure to pay the subcontractors was

partially Medallion's fault, since Medallion withheld payment on the outstanding invoices for work already performed.

4. <u>Faulty Welds</u>. Finally, Harpole's faulty welds did not give Medallion the right to terminate the MSC for cause. Although one of the grounds to terminate is if Harpole "breaches any warranty," the warranty period does not begin until "the date that Company gives acceptance of the services or first uses the serviced item(s)." MSC ¶ 5(a). Under the undisputed facts, the warranty period had not begun when Medallion threw Harpole off the job.

Furthermore, Harpole's faulty welds did not violate "applicable law" under paragraph 4(b). Regulations detailing proper welding procedures are incorporated into the contract as an "Applicable Law." Although it is possible that a faulty weld may be caused by not following such procedures, there was also testimony that any welder may produce a poor weld that needs to be repaired. Moreover, the course of conduct of the parties indicated that a bad weld would not be a material breach, but would be fixed by Harpole. *See generally Shaver v. Schuster*, 815 S.W.2d 818, 824-825 (Tex. App. 1991); *Enserch Corp. v. Rebich*, 925 S.W.2d 75, 82 (Tex. App. 1996) ("Waiver is defined as an intentional relinquishment of a known right or intentional conduct inconsistent with claiming it."); *R. Conrad Moore & Associates, Inc. v. Lerma*, 946 S.W.2d 90, 93 (Tex. App. 1997) ("Intentional relinquishment of a known right can be inferred from intentional conduct which is inconsistent with claiming the contractual right.").

C. <u>Termination Without Cause</u>.

Even though Medallion had no right to terminate the MSC for cause, it had right to terminate all of the pending Work Orders without cause, pursuant to paragraph 21(b):

> Notwithstanding the above, Company shall have the right to terminate any Work Order at any time without cause. In such case, Company shall pay Contractor for all Work property performed prior to termination and shall reimburse Contractor for all documented direct expenses (not overheard or profit) reasonably and

-10-

necessarily incurred by Contractor in the demobilization of Contractor's Goods and Contractor's Personnel.

The Court finds that Medallion terminated the Work Orders under this provision as of July 28, 2016. Mr. Harpole testified that every contract he ever signed had a similar provision, so it did not come as a surprise to him. It seems to the Court a one-sided provision, but it does not rise to the level of unconscionability, and the Court will enforce it.

1. <u>Amounts Due to Harpole</u>. On the date of termination, Harpole had outstanding invoices for work done on the Permian Resources job of $651,000. Medallion owes this amount to Harpole, less the credits and offsets discussed below.

Medallion also owes Harpole $9,000, which is the fair rental charge for 4,200 skids. The $7,320 cost of hauling the skids back to Harpole's yard also is a direct expense of demobilization.

Finally, Medallion owes Harpole $17,000 in demobilization expenses for the return of certain "frack tanks."

The following table summarizes the amounts due:

| Item | Amount | MSC paragraph |
|---|---|---|
| 1. Permian Resources work performed on or before July 27, 2016 | $651,000 | 21(b) |
| 2. Skid rental charge | $9,000 | 21(b) |
| 3. Cost of hauling skids | $7,320 | 21(b) |
| 4. Demobilizing frack tanks | $17,000 | 21(b) |
| Total | $684,320 | |

-11-

Harpole's other damages arguments, including arguments for lost profits[9] and the recapture of the 23.97% bid discount, are overruled.

2. <u>Medallion's Offsets</u>. Upon termination under paragraph 21(b), Harpole is only owed for "Work properly performed prior to termination. . . ." and for demobilization costs. The trial evidence showed that not all of Harpole's work was properly performed, and that the cost to fix the improperly performed work was substantial.[10]

There is no dispute that two leaks were found and had to be fixed. MSC, ¶¶ 5(a) and 5(e). Harpole is liable for Medallion's reasonable costs to fix Harpole's improper work.[11] The contract price agreed to by Medallion and Oryx was a maximum of $95,000 to find and fix one leak. The Court finds that this amount was reasonable. While Oryx eventually charged, and Medallion eventually paid, more than this, the excess was not reasonable. *See generally Mustang Pipeline Co, Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 200-201 (Tex. 2004) ("Evidence of the amounts charged and paid, standing alone, is no evidence that such payment was reasonable and necessary."), *citing Dallas Ry. & Terminal Co. v. Gossett,* 294 S.W.2d 377, 383 (Tex. 1956) ("[I]t

---

[9] Harpole is not entitled to lost profits or other consequential damage, because, inter alia, the MSC prohibits collection of such damages. MSC, ¶ 13(b)(2). Such a contractual limitation on damages generally is upheld under Texas law. *See Weaver v. Jamar*, 383 S.W.3d 805, 812 (Tex. App. 2012) ("Parties to a contract are free to limit or modify the remedies available for breach of their agreement"); *DaimlerChrysler Motors Co., LLC v. Manuel*, 362 S.W.3d 160, 180-81 (Tex. App. 2012).

[10] The MSC is somewhat confusing and inconsistent about Harpole's obligation to fix or pay for substandard work. Paragraph 5(a) (Service Warranty), for example, is not completely consistent with ¶ 5(c). Furthermore, ¶ 5(a) could be read to restrict Medallion's right to recover expenses paid to a third party if Medallion does not first offer Harpole the opportunity to fix any warranty problems. Read together, however, the Court finds that the MSC allows Medallion to offset the reasonable cost of fixing improperly performed work from any amounts Medallion owes Harpole.

[11] "If Contractor fails to . . . complete such re-performance . . . within a reasonable period of time . . . then Company shall have the right to have the nonconforming services re-performed by any other contractor . . . and Contractor shall be responsible for all reasonable costs incurred." MSC ¶ 5(a).

-12-

is now well settled that proof of the amounts charged or paid does not raise an issue of reasonableness, and recovery of such expenses will be denied in the absence of evidence showing that the charges are reasonable.").

As stated above, Oryx discovered a second leak after it fixed the first leak, so it is reasonable to allow Medallion a second $95,000 offset.

Harpole is also responsible for Medallion's out-of-pocket cost to redo some of the welds Harpole fabricated. MSC ¶¶ 5(a) and/or 5(c). There is no evidence that the weld repairs were unnecessary, nor that the cost ($195,428.41) was unreasonable. Medallion paid the charges.

Third, Harpole is responsible for the cost to redo improper work on a section of the Permian Resources right of way. In that section, the landowner specified that the topsoil and subsoil were not to be mixed as part of the pipeline laying process. Harpole mixed them. Harpole did not dispute that the work needed to be redone, nor the reasonableness of the charge.

Fourth, Medallion has two offsets because of the Tech Con and Hoot Johnson liens filed on the Permian Resources job. MSC, ¶ 8.

Medallion is not entitled to recover for the cost of hydrostatic testing or inspecting Harpole's work. Paragraph 5(e) provides: "If a defect is discovered, Contractor shall bear the expense of dismantling, repairing and replacing the Work and restoring it to its proper condition." While Medallion may inspect Harpole's work, it must pay the expense of doing so. Medallion's other requests for damages, including the cost of cover, are overruled.

Medallion's offsets and credits are summarized as follows:

| Item | Amount | MSC paragraph |
|---|---|---|
| 1. Fixing the two leaks | $190,000 | 5(a) and/or 5(e) |
| 2. Replacing defective welds | $195,428.41 | 5(a) and/or 5(e) |
| 3. Redoing the ROW work | $54,899 | 5(a) |
| 4. Tech Con Lien | $122,843.30 | 8 |
| 5. Hoot Johnson Lien | $150,000 | 8 |
| Total | $713,170.71 | |

Subtracting the amount Harpole owes Medallion from the amount Medallion owes Harpole, the result is $28,850.71 owed by Harpole to Medallion.

D. <u>Attorney Fees</u>.

Medallion asserts it is entitled to attorney fees. Under Tex. Civ. Prac. & Rem. Code § 38.001, "A person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for: …(8) an oral or written contract." However, § 38.001 does not apply when parties have contracted to a different fee-recovery standard. *See Bankcard Processing Int'l, L.L.C. v. United Bus. Servs., L.P.*, 2012 WL 3776024, at *8 (Tex. App.) ("When parties include such a provision in a contract, the language of the contract, rather than the language of the statute, controls."); *Intercontinental Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 653 (Tex. 2009).

The MSC provides:

"[T]he prevailing party in any litigation relating to this agreement … shall be entitled to recover its reasonable and necessary attorneys' fees and costs of litigation from the other party."

The Court determines that neither party can fairly be characterized as the "prevailing party in this litigation. When trial commenced, Harpole asked for a judgment against Medallion of more than $2,024,561.22, while Medallion asked for a judgment against Harpole of $1,294,019. The final result is nowhere close to either request. Further, the Court has overruled most of the legal

theories advanced by the parties. Since neither party is the prevailing party, no attorney fees will be awarded.[12]

### III. Conclusion

All claims, offsets, and credits considered, Harpole owes Medallion $28,850.71. A judgment for that amount will be entered by separate order. The judgment will require Medallion to pay off the two liens for the amounts indicated.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: January 30, 2017

Copies to:

William Davis
Nephi Hardman
6709 Academy NE, Ste. A
Albuquerque, NM 87109

Richard Staff
Jeff Weems
6363 Woodway, Suite 1100
Houston, TX 77057

William Steven Bryant
600 Congress Avenue, Ste. 2200
Austin, TX 78701

---

[12] Because the Court finds that neither side prevailed, it will not award prejudgment interest. *See Concorde Limousines, Inc. v. Moloney Coachbuilders, Inc.*, 835 F.3d 541 (5th Cir. 1987), citing *Cavnar v. Quality Control Parking*, 696 S.W.2d 549 (Tex. 1985). *See also Matthews v. DeSoto*, 721 S.W.2d 286, 287 (Tex. 1986) (absent exceptional circumstances, prejudgment interest should be awarded to a prevailing party in a contract case).